MINNESOTA MINING AND MANUFAC-
TURING COMPANY, Plaintiff,

v.

George P. SHULTZ and the United
States of America, Defendants.

Civ. A. No. 83–3819.

United States District Court,
District of Columbia.

Feb. 28, 1984.

Jacob P. Billig, Terrence D. Jones, Richard A. Allen, Marc J. Fink, Billig, Sher & Jones, P.C., Washington, D.C., for plaintiff.

John Polk, Asst. U.S. Atty., Diane Kozub, Sp. Asst. U.S. Atty., Dennis Gallagher, Gen. Counsel, U.S. Dept. of State, Washington, D.C., for defendants.

William J. Spriggs, Peter N. Weiss, Spriggs, Bode & Hollingsworth, Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

In this action for declaratory and injunctive relief Minnesota Mining and Manufacturing Company (3M), a disappointed bidder, seeks to enjoin the United States Department of State (State Department) from proceeding with its contract with defendant-intervenor, General Binding Corporation (GBC), for a one-year procurement of laminate sheets to be utilized on United States machine readable passports (MRPs).[1] 3M filed an application for a temporary restraining order with its original complaint and on January 12, 1984, this motion was denied. The motion presently under consideration is plaintiff's motion for a preliminary injunction. Defendants and defendant-intervenor oppose the motion. After consideration of the memoranda submitted by the parties and oral argument on the motion, the Court finds that plaintiff made a showing sufficient to entitle it to a preliminary injunction.

## BACKGROUND

The State Department is the executive agency charged with the statutory authority and responsibility to issue passports to United States citizens and nationals.[2] 22 U.S.C. § 211a–18 (1976 ed. & Supp. V), 22 CFR Part 51. In 1976, the State Department implemented a program to improve the security, durability, and overall quality of U.S. passports.[3] One component of this systems upgrade was the employment of a laminate to cover that page of the passport containing the photograph and vital data of the holder. These laminated passports, which are capable of being read by Optical Character Readers (OCRs), are necessary for the State Department to convert to the MRP system presently being instituted by governments throughout the world under

---

**1.** 3M also requests that this Court set aside the contract and declare that the State Department must award the contract to 3M as the sole responsive bidder to the Request for Proposals.

**2.** In Fiscal Year 1981, the State Department issued 3,222,346 passports. In Fiscal Years 1982 and 1983, the Department issued 3,603,446 and 4,198,143 passports, respectively.

**3.** One impetus for the State Department's decision to improve the security features of the passport system was a study of the United States Department of Justice showing that the use of counterfeit passports is a serious problem, facilitating, *inter alia,* illegal immigration and drug smuggling.

guidelines established by the International Civil Aviation Organization (IACO).[4]

The State Department began using 3M's Confirm Type P laminate in 1979 pursuant to a sole-source contract awarded to 3M. 3M's Confirm laminate is a security film which utilizes retro-reflective glass beads embedded in a thin laminated sheet. Thus, when a light beam is shone on the laminate at a particular angle, the underlying material cannot be seen and the glass beads depict a logo which stands out sharply from the face of the sheet. The State Department began issuing MRPs with Confirm laminate in February 1981, and by 1983 3M had supplied the Department with more than three million sheets of this laminate.

On February 12, 1982, the State Department issued a competitive solicitation for a negotiated procurement of laminated sheets for use on MRPs. Three firms, Polaroid Corporation, GBC, and 3M, responded to the Request for Proposals (RFPs) and the Bureau of Consular Affairs evaluated the technical information in each proposal. Thereafter, the State Department informed the three firms by letter dated December 23, 1982, that their initial proposals were technically defective and that failure to correct these defects would result in the rejection of their respective bids. Prior to this letter, however, several officials of the State Department met with Stephen R. Mayer on December 7, 1982. Mayer, who prepared the GBC proposal submitted in response to the RFP, discussed certain defects in GBC's laminate with these officials. The Department officials present at the meeting were John Stever, Contracting Officer, Sheldon Rosen

of the Bureau of Consular Affairs, and Frank T. Kubic, the Contracting Officer's Technical Representative for the RFP and author of the RFP.

On June 16, 1983, Kubic advised the Department that only 3M's Confirm Type S laminate and GBC's laminate met the requirements of the solicitation.[5] Shortly thereafter, the Department solicited the best and final offers of these companies and on August 30, 1983, the State Department awarded GBC Contract No. 1044–236012 as the lowest technically acceptable bidder.[6]

3M was notified of the award in September and immediately requested the Department to release a sample of GBC's laminate and copies of the Department's evaluations. Although the State Department refused to release these materials, 3M secured a purported sample of GBC laminate submitted in response to the RFP. On December 9, 1983, 3M met with several officials from the State Department. At that meeting, Dr. Grant, the Technical Manager of the Security Products Group, Safety and Security Systems Division of 3M, used the purported sample to demonstrate the relative ease with which the GBC product could be counterfeited. While none of the Department's officials disputed Dr. Grant's findings, Senior Deputy of Consular Affairs Edward Rowell did state that the Department's decision to award the contract to GBC was based on cost considerations and not on the security features built into the laminate. At the conclusion of the meeting, 3M requested the Department to terminate the contract with GBC and to award

4. Approximately half of the passports presently issued by the State Department are distributed by the five passport offices which have converted to the MRP system.

5. 3M submitted two types of Confirm laminates in response to the RFP. The first, Confirm Type P employed a pouch for the photograph to correct certain defects in the laminate's adhesion to polaroid photographs. The second, Confirm Type S has no pouch and employs more adhesive than Type P.

GBC submitted a laminate that uses the security feature generally known as "Scrambled Indicia" and referred to by GBC as "Eye Detector."

The scrambled image printed on the laminate can be unscrambled and read with a special lens.

6. GBC's contract with the State Department is a requirements contract for the period August 31, 1983, to August 30, 1984. The contract contains no option provisions that would permit its extension beyond August 30, 1984 without following Federal Procurement Regulations for competitive procurements. The Department anticipates that a competitive solicitation for a successor contract will be effective on August 31, 1984.

the contract to 3M as the sole responsive bidder under the RFP. When the State Department did not reply on December 21, 1983, as requested, 3M insituted this suit.

## DISCUSSION

### A. Legal Standards

The criteria governing the issuance of preliminary injunctive relief in the District of Columbia are well known. In order to prevail on a motion seeking this extraordinary relief, plaintiff must demonstrate 1) that it is likely to succeed on the ultimate merits of its claim; 2) that it will be irreparably injured if preliminary relief is denied; 3) that the issuance of injunctive relief will not cause significant harm to other interested parties; and 4) that the public interest favors the issuance of a preliminary injunction. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977); *Virginia Petroleum Jobbers Association v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958). The basic principles that define the scope of judicial review and intervention in government procurement cases are equally well established in this Circuit. Judicial review of government procurement decisions is governed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06 (1976 ed. & Supp. V 1981). Under the APA, a reviewing court may set aside an agency's final decision only if it determines the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This standard of judicial review, commonly referred to as the "arbitrary and capricious" standard, is highly deferential and thus, it prohibits a court from substituting its judgment for the sound judgment of an agency. *See Bowman Transportation v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C.Cir.1981). Notwithstanding the deference given to an agency's final determination, a reviewing court has a duty to overturn an agency procurement decision where a disappointed bidder meets its heavy burden of showing that 1) the procurement official's decision on matters committed primarily to his own discretion had no rational basis or 2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Kentron Hawaii, Limited v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973); *Accord, Aero Corp. v. Department of the Navy*, 493 F.Supp. 558, 566 (D.D.C.1981); *Dickey-John Corp. v. Bergland*, 444 F.Supp. 451, 455 (D.D.C.1978). As the Court of Appeals admonished in *Allis-Chalmers Corp., Hydro-Turbine Division v. Friedkin*, 635 F.2d 248 (3d Cir.1980),

[c]ourts ... have an obligation to ensure agency compliance with applicable statutes and regulations [in awarding contracts, and] interests that must be weighed [include] practical considerations of efficient procurement of supplies for continuing government operations, the public interest in avoiding excessive costs and bidder's entitlement to fair treatment through adherence to statutes and regulations ....

It is with these sound principles in mind that this Court grants the motion of 3M for a preliminary injunction.

### B. Likelihood of Success on the Merits

3M attacks the legality of the State Department's award of the contract to GBC on several grounds. First, 3M contends that the Department's decision to award the contract to GBC was arbitrary and capricious since GBC's laminate did not meet the RFP's specifications and minimum requirements with respect to counterfeitability and machine readability. Second, 3M maintains that the State Department violated certain Federal Procurement Regulations (FPRs), 41 CFR § 1–1.000 *et seq.* (1983).[7] Each of these allegations

---

7. 3M also asserts that the State Department's award of the contract to 3M was a deprivation

rests ultimately upon either the Department's interpretation and application of pertinent provisions of the RFP or its interpretation of and compliance with pertinent FPRs. Thus, the first critical inquiry for this Court when evaluating 3M's request for preliminary injunctive relief is whether there is a substantial likelihood that 3M can demonstrate on the merits that there is no rational basis for the State Department's interpretation and application of the RFP or that the procurement procedure involved a clear and prejudicial violation of pertinent FPRs.

1. The Request for Proposals

The RFP states in pertinent part:

### LAMINATE SPECIFICATIONS

The laminate for the U.S. MRP must meet the following minimum requirements both before and after application to MRP.

4. The material shall be most difficult and expensive to counterfeit.

6. The material and the security features contained shall not affect the transparency for the laminated product nor interfere with the "Machine Readable" optical characters nor alter the clarity or background color of the data and the photograph under the laminated page to the eye.

15. The visible security feature shall be so placed and spaced as to extend ... over ... at least 30 percent of the printed information in the machine readable region.

### SECURITY CHARACTERISTICS

c) Any security feature incorporated into the MRP by virtue of the laminate, shall not interfere with the visual inspection of the personal data nor interfere with accurate machine reading.

The phrase "shall be most difficult" is defined as

The compairson [sic] shall be made with the difficulty required to: ... counterfeit ... the laminated material currently used in the manufacturing of the Department's (MRP) passport.

3M maintains that the RFP establishes "minimum requirements" which a laminate must satisfy to be considered technically acceptable. The State Department's refutation of 3M's interpretation, however, appears to lack rationality. Two of the five officials of the Department competent to testify on the issue gave questionable interpretations. For example, Sheldon Rosen testified that the RFP requirements are in a "Boolean relationship" as a result of the RFP's definition of the "shall be most difficult" requirement.[8] In other words, under Rosen's interpretation of the RFP requirements, a laminate which satisfied any one of the enumerated specifications would be technically acceptable.

The clear and unambiguous language of the RFP, which was not written in the disjunctive, explicitly states that the laminate for U.S. MRPs "must meet the ... minimum requirements both before and after application to MRP." Rosen's "Boolean" interpretation would produce the incongruous result of the selected laminate for MRPs being virtually impossible to counterfeit, but yet extremely easy and inexpensive to alter without leaving any visible residual indication of the alteration. This result, however, is in derogation of the security goals of the RFP. Moreover, Leroy Wallin, Chief of the Department's Contracts Branch, testified that in order for a laminate to be considered acceptable, it must meet all the minimum requirements of the RFP.

---

of its property interest in contravention to the Fifth Amendment. The Court will not address this issue since plaintiff's motion for preliminary injunction can be resolved on nonconstitutional grounds.

8. Rosen testified that "Boolean" is a type of algebra used in computer logic and it indicates the presence of an "or" relationship between the features as opposed to an "and" relationship.

3M also contends that the Department's interpretation of the "shall be most difficult" requirement is without any rational basis. The State Department reads this language with its accompanying definition as requiring laminates to be comparable and not equal or superior to 3M's Confirm Type P laminate, the laminate used on MRPs at the time of the solicitation. The Department's rationale for its interpretation is that the minimum requirements of the RFP are "multivalent" rather than "inherently objective". Thus, the Department argues that a determination of whether a laminate satisfies the security needs must necessarily be discretionary.

■ The general rule that the interpretation of procurement regulations is a matter committed primarily to the discretion of the contracting officer does not strip a reviewing court of its authority and obligation to scrutinize the reasonableness of an agency's interpretation. *See Allis-Chalmers Corp., Hydro-Turbine Division*, 635 F.2d 248. The Department's interpretation of the "shall be most difficult" requirement appears flawed. The RFP designated the laminate utilized in the preparation of the MRPs at the time of the solicitation as the objective standard against which any proposed laminate would be compared for compliance with the minimum requirements of the RFP. Kubic testified in his affidavit that the definition of "shall be most difficult" was included in the RFP at the request of the laboratory testing technicians to provide a "base line" upon which their determinations could be measured. Thus, it appears that the State Department deliberately designated 3M's Confirm Type P laminate as the yardstick of minimum requirements.

■ The Department also asserts, however, that the word "comparable" does not mean equal to or better than, but merely "capable of being compared." This also is seemingly a strained interpretation of the RFP's definition of "shall be most difficult." The RFP does not use the word "comparable." Rather it states that "[t]he compairson [sic] shall be made with the difficulty required to: alter, duplicate, counterfeit or remove the laminated material currently used in the manufacturing of the Department's (MRP) passport." The word "comparison" unlike the adjective "comparable" is a noun denoting the act of determining the degree of superiority or inferiority in quality between two or more objects. The comparison to which the RFP made reference was between 3M's Confirm Type P and the laminates submitted in response to the solicitation. Given the foregoing considerations, there is a substantial likelihood that 3M may demonstrate on the merits that the Department's interpretation of the aforementioned provisions of the RFP is lacking in rationality.

■ 3M's assertion that the State Department acted arbitrarily and capriciously by awarding the contract to GBC is premised upon the alleged nonresponsiveness of GBC's laminate. Since this was not an advertised sealed-bid procurement, the concept of "responsiveness" is not subject to a strict and technical interpretation. *Kentron*, 480 F.2d at 1171. Rather, in negotiated procurements, responsiveness is by nature a subject of negotiation. *Id.* This grant of discretion in the negotiated procurement process is not, however, a blank check to the agency to abuse its discretion. To the contrary, courts may examine an allegation of nonresponsiveness where the RFP explicitly states that an offeror must comply with certain essential requirements of the solicitation to be considered for the award. *Computer Machinery Corp.*, 55 Comp.Gen. 1151, 1154, (1976). An important question to be considered by a court when reviewing a negotiated procurement decision is whether the agency breached its duty to consider each offeror's bid fairly and honestly. *Cf. Keco Industries, Inc. v. United States*, 428 F.2d 1233, 1240, 192 Ct.Cl. 773 (1970); *General Electric Co. v. Seamans*, 340 F.Supp. 636, 642 (D.D.C. 1972). Under this role of "fair treatment", an agency cannot disregard the material terms of its RFP for only one offeror as this would be tantamount to not giving all offerors a fair and equal opportunity to

compete on the same basis. *See* 41 CFR § 1–3.805–1(d).

The factual support for 3M's assertion that the State Department's award of the contract was arbitrary and capricious is 3M's demonstration that GBC's laminate can be easily and inexpensively counterfeited. However, the authenticity of the purported sample used to counterfeit GBC's laminate is questionable. Dr. Grant testified that he procured the sample from an employee of Polaroid. However, Dr. Grant did not know how or from whom the Polaroid employee secured the purported sample of GBC's laminate.

Assuming *arguendo* that the sample is authentic, there is also evidence in the record that 3M's laminate may be readily counterfeited by simple and inexpensive methods.[9] Moreover, plaintiff has proffered no evidence that the State Department's testing of the counterfeitability of its laminate was performed unfairly or dishonestly. Accordingly, plaintiff failed to demonstrate that there is a substantial likelihood of success on the merits that the Department's determination that GBC's laminate met the counterfeitability requirement of the RFP was arbitrary and capricious.

■ Under the terms of the RFP, the visible security feature of a laminate was required to extend over at least thirty percent of the printed information in the machine readable zone of the passport page. The critical aspect of plaintiff's allegation that GBC's laminate did not satisfy this requirement is that the State Department purposely disregarded or waived this essential requirement for GBC without affording 3M and Polaroid the same treatment. The evidence in the record sufficiently shows that there is a substantial likelihood that 3M can prove on the merits that officials of

the State Department only advised GBC about this substantial change in the RFP. In a memorandum dated September 14, 1982, Kubic informed John Stever, the contracting officer, that "[t]he location of the GBC-red ink in the machine readable zone is not acceptable. The present location of the red ink is in conflict with [the ICAO] item 33, page 6." Further, Stever and Sheldon Rosen testified at their deposition that at the meeting held on December 7, 1982, GBC was orally advised that the Department was deleting this requirement. The waiver of an essential feature of the solicited product which is not equally available to all offerors may be inherently unfair and prejudicial.[10]

### 2. Violations of the FPRs

3M also sufficiently demonstrated that there is a substantial likelihood that the State Department violated section 1–3.805–1(d) of the FPRs. Section 1–3.805–1(d) states in pertinent part:

When, during negotiations, a substantial change occurs in the Government's requirements or a decision is reached to relax, increase, or otherwise modify the scope ... statement of requirements, such change or modification shall be made in writing as an amendment to the request for proposals, and a copy shall be furnished to each prospective contractor. Oral advice of change or modification may be given if: (1) The changes involved are not complex in nature, (2) all prospective contractors are notified simutaneously (preferably by a meeting with the contracting officer), and (3) a record is made of the oral advice given. In such instances, however, the oral advice should be promptly followed by a written amendment verifying such oral advice previously given.

---

**9.** GBC submitted the supplemental affidavit of Alfred V. Alasia of Graphic Security Systems Corporation and the affidavit of Robert O. Fulton, Manager of Security for Ontario Banknote Ltd. and Security Card Systems, Ltd., as evidence of the counterfeitability of 3M's product.

**10.** Indeed, 3M argues that the State Department's failure to inform it of the changes in the RFP's requirements was in fact prejudicial to 3M. Einar D. Horne testified at the hearing held on February 6, 1984, that 3M could have submitted a third laminate, "SCOTCHCAL", in response to the RFP at a price less than GBC's bid.

It is clear that the alleged change occurred during negotiations with the three offerors. There is no evidence that the State Department advised 3M and Polaroid of the alleged oral modification of the RFP's machine readability requirement. On the contrary, the record reflects that the State Department sent the three offerors letters requesting them to make resubmission of their bid samples due to certain enumerated defects. None of the letters mentioned any change or waiver of the requirement that thirty percent of the visible security feature be in the machine readable zone.

C. Irreparable Harm

 In government procurement cases, the inability of a disappointed bidder to recover bid preparation costs is insufficient to justify the issuance of a preliminary injunction. *See Dickey-John Corp. v. Bergland,* 444 F.Supp. 451, 455 (D.D.C. 1978). However, loss of anticipated profits in excess of bid preparation costs is generally adequate injury to constitute irreparable harm. *Id.* This is especially true where the disappointed bidder demonstrates a strong likelihood of success on the merits. *Id.* Plaintiff, in this case, provided competent testimony that it anticipated profits significantly greater than its bid preparation costs.[11] Moreover, as previously discussed, there has been an ample demonstration that 3M has a substantial likelihood of success on the merits of its claim.

D. Other Criteria for Preliminary Injunctive Relief.

In a case of this nature, balancing of the equities is an important factor for consideration. The monetary harm which defendants and defendant-intervenor will suffer as a result of this preliminary injunction do not outweigh the strong public and national interest in maintaining the integrity of the United States passport system. The State Department only recently exhausted its supply of 3M Confirm Type P laminate.

3M indicated that it could supply 250,000 sheets of Type P to the State Department on three days notice. It is most unlikely that this slight delay will be disruptive to the passport system. On the contrary, it appears that the issuance of preliminary relief is necessary not only to prevent excessive expenditures and disruption of the MRP system, but also to preserve the integrity and good faith of officials involved in the procurement process. Accordingly, the motion of plaintiff for preliminary injunction must be granted. An Order consistent with this Memorandum Opinion shall be entered on this date.

---

**11.** Einar D. Horne, General Manager of 3M's Safety and Security Systems Division testified that 3M's profit on the sale of four million sheets of Confirm Type S laminate passports at 22 cents per sheet would have substantially exceeded its bid preparation costs.