**IRVIN INDUSTRIES CANADA, LTD., Appellant,**

v.

**UNITED STATES AIR FORCE, Appellee.**

No. 89–5122.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1990.

Judgment Issued Jan. 23, 1990.

Lanny J. Davis, for appellant. Richard M. Stalbach also entered an appearance, for appellant.

John C. Martin, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, for appellee.

Before EDWARDS, Circuit Judge, ROBINSON, Senior Circuit Judge, and REVERCOMB,* District Judge.

Opinion for the Court filed by Senior Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Senior Circuit Judge:

Irvin Industries Canada, Ltd., participated in competitive bidding for a contract to provide the United States Air Force with parachute releases. The Air Force awarded the contract to Scot, Incorporated, another bidder. Irvin protested unsuccessfully to the General Accounting Office and then sought relief in the District Court. After denying Irvin a preliminary injunction, the court granted summary judgment for the Air Force. Irvin challenged those rulings here, and we reversed and remanded with instructions to require the Air Force to afford all potential bidders an opportunity to submit new or amended proposals.[1] We stated that this opinion would follow.

I

In 1987, the Air Force issued to prospective offerors a letter request[2] for technical

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. *Irvin Indus. Canada, Ltd. v. United States Air Force,* No. 89–5122 (D.C.Cir. Jan. 23, 1990).

2. Letter Request for Technical Proposal, F41608–87–R–0806, [hereinafter Letter Request], Appendix (App.) 123–203. Attached thereto were a number of related documents, some of which we hereinafter cite individually.

proposals respecting a parachute rip cord release meeting the exigencies of ejection from high-speed aircraft.[3] This would be a "device[ ] connected to the parachutes of US Air Force crewmembers which [is] designed to ensure the automatic opening of the parachute under emergency conditions such as when the crewmember is unconscious or disabled."[4]

Procurement by federal executive agencies, including the military departments and defense agencies, is governed primarily by the Federal Acquisition Regulation,[5] which permits two-step sealed bidding[6] when specified conditions coexist.[7] Electing this methodology, the Air Force in its letter request invited prospective offerors to submit technical proposals containing all pertinent information save price.[8] The request stated that "[t]echnical evaluation of the proposals shall be performed by a team of engineering personnel, equipment specialists, and technicians,"[9] and that

> [t]he following factors will be evaluated:
> 1. Technical
> 2. Schedule
> 3. Data
> 4. Manufacturing Capability.[10]

The request called specifically for a critical design review within 30 days after the date of the contract award,[11] and for delivery of

**3.** The Air Force explained:

> Presently, the Air Force uses a combination of ballistic and mechanical parachute rip cord releases. In the past, the F–1B mechanical release has not been able to fulfill the requirements for high speed ejection aircraft. The F–1B timer control cannot be set below the 1 second as required. The ballistic releases, even though they are capable of meeting the requirements below 1 second, have demonstrated reliability below our expectations. On the other hand, the F–1B mechanical release has demonstrated high reliability. Therefore, there exists a need to develop a new mechanical release that meets our current requirements.

Statement of Work ¶ 1 at 1, App. 130.

**4.** Affidavit of Col. Arthur E. Schmitt, Chief, Item Management Division, Directorate of Materiel Management, San Antonio Air Logistics Center (filed Feb. 17, 1989) ¶ 2, App. 234.

**5.** The Federal Acquisition Regulations System was established in 1983 for the purpose of codifying and publishing uniform practices and procedures for acquisitions by all executive agencies. 48 C.F.R. § 1.101 (1989). The system consists of the Federal Acquisition Regulation, which is the primary document, and agency acquisition regulations implementing or supplementing it. *Id.* Such regulations for the military departments and defense agencies are issued subject to the authority of the Secretary of Defense. *Id.* § 1.301(d)(1). Neither litigant has referred to any agency regulation bearing on this case.

**6.** The Federal Acquisition Regulation describes the process:

> Two-step sealed bidding is a combination of competitive procedures designed to obtain the benefits of sealed bidding when adequate specifications are not available. An objective is the development of a sufficiently descriptive and not unduly restrictive statement of the government's requirements, including an adequate technical data package, so that subsequent acquisitions may be made by conventional sealed bidding. This method is especially useful in acquisitions requiring technical proposals, particularly those for complex items. It is conducted in two steps:
>
> (a) Step one consists of the request for, submission, evaluation, and (if necessary) discussion of a technical proposal. No pricing is involved. The objective is to determine the acceptability of the supplies or services offered. As used in this context, the word "technical" has a broad connotation and includes, among other things, the engineering approach, special manufacturing processes, and special testing techniques. It is the proper step for clarification of questions relating to technical requirements. Conformity to the technical requirements is resolved in this step, but not responsibility as defined in 9.1.
>
> (b) Step two involves the submission of sealed priced bids by those who submitted acceptable technical proposals in step, one. Bids submitted in step two are evaluated and the awards made in accordance with Subparts 14.3 and 14.4.

*Id.* § 14.501(a)–(b).

**7.** See *id.* § 14.502. The propriety of two-step sealed bidding is not questioned in this case.

**8.** See Letter Request, *supra* note 2, ¶¶ 3(a), 6, J. App. 123–124.

**9.** *Id.* ¶ 7, App. 124.

**10.** *Id.,* App. 124.

**11.** "Critical Design Review (CDR) configuration audit and demonstrations will be conducted 30 days after contract award. During the review, the contractor shall demonstrate the capability of the release to meet the design, contruction [*sic*] and performance characteristics contained in the purchase description." Statement of

first article test reports within 180 days after that date.[12] Offerors were admonished to heed all requirements.[13] In regard to step two, the request stated that "[c]ontractors with acceptable technical proposals will then be required to submit Pricing information...."[14] The scheme of the solicitation thus was to deal with non-price considerations in step one, and then "to have a price competition between technically acceptable offerors in step two."[15]

Irvin and three others responded with technical proposals. Irvin submitted a modified version of an off-the-shelf product which it was supplying to air forces of other nations,[16] but it did not measure up to the Air Force's specifications.[17] Scot, which also lacked a suitable product, offered a design of a technically conforming parachute release,[18] but one requiring more time to develop than the terms of the solicitation allowed.

After conducting its technical evaluation, the Air Force deemed Scot's step-one pro-posal acceptable[19] and turned down the remaining three.[20] The Air Force acknowledged that Scot's proposal "does not meet the delivery requirements as specified,"[21] but felt that "the high confidence of success due to technical acceptability outweighs the delayed availability of the units."[22] Irvin's technical proposal was rejected as nonresponsive to the specifications of the purchase description.[23]

The Air Force had envisioned a firm fixed-price proposal as the end result of step two of the solicitation.[24] Although Scott did propose in that light, there was no meaningful price competition.[25] This consideration contributed to the Air Force's belief that it was "necessary to employ negotiation procedures to preclude excessive pricing."[26] What eventuated therefrom was the award to Scot, some seventeen months after the closing date for tender of technical proposals, of a contract deviating from the terms of the solicitation

---

Work ¶ 2.2, App. 130. See Affidavit of Frank X. Chevrier, President and Chief Engineer, FXC Corporation (filed Feb. 24, 1989) ¶¶ 3, 5 [hereinafter Chevrier Affidavit], App. 59.

**12.** Analysis of Grounds for Irvin Proposal Rejection at 5 [hereinafter Analysis], App. 219; Chevrier Affidavit, *supra* note 11, ¶¶ 3, 5, App. 59.

**13.** "It is strongly advised that the requirement of the technical proposal as outlined in the Statement of Work be strictly complied with in all respects. Offerors should make every effort to insure that their proposals are fully and clearly acceptable without additional explanation or information. However, the Government may, at its sole discretion, request additional information from offerors as specified in [Federal Acquisition Regulation] 14–503–1 for the purpose of clarifying or supplementing but not basically changing any technical proposal as submitted." Letter Request, *supra* note 2, ¶ 6, App. 124.

**14.** Letter Request, *supra* note 2, ¶ 3(c)(2), App. 123.

**15.** Brief for Appellee at 8–9.

**16.** *Irvin Indus. Canada, Ltd. v. United States Air Force,* Civ. No. 88–3574 (D.D.C.) (memorandum and order) (filed Mar. 22, 1989) at 2 [hereinafter *Memorandum and Order* ], App. 3.

**17.** FXC Corporation, another bidder, similarly tendered an existing but technically nonconforming design. Chevrier Affidavit, *supra* note 11, ¶¶ 3–4, App. 59.

**18.** Letter from Samuel Levin, Vice President, Quality Assurance and Administration, Scot, Incorporated, to Teresa Rendon, Directorate of Contracting and Manufacturing, San Antonio Air Logistics Center (May 29, 1987) [hereinafter Scot Letter], App. 61–62.

**19.** Air Force Technical Evaluation Documents, Attachment 4, App. 74–75.

**20.** *Id.,* Attachments 1–3, App. 65–73, 76–77.

**21.** *Id.,* Attachment 4 at 1, App. 74. See also Affidavit of Teresa Rendon, Contract Negotiator, Directorate of Contracting and Manufacturing, San Antonio Air Logistics Center (filed Feb. 17, 1989) ¶ 19 [hereinafter Rendon Affidavit], App. 122; Affidavit of Yvonne Craig, Contract Negotiator, Directorate of Contracting and Manufacturing, San Antonio Air Logistics Center (filed Feb. 17, 1989) ¶ 7 [hereinafter Craig Affidavit], App. 231.

**22.** Air Force Technical Evaluation Documents, Attachment 4 at 1, App. 74.

**23.** *Id.,* Attachment 3, App. 72–73.

**24.** Rendon Affidavit, *supra* note 21, ¶ 13, App. 118.

**25.** *Id.*

**26.** *Id.,* App. 118–119.

by allowance of 154 rather than 30 days for the critical design review [27] and 526 rather than 180 days for delivery of first article reports,[28] and by providing for payment on some line items on a cost-plus-fixed-fee basis.[29]

Irvin protested to the General Accounting Office [30] that the Air Force erred in finding its proposal technically unacceptable and, alternatively, that the Air Force was estopped from making such a determination because, Irvin said, the Air Force had indicated its satisfaction with a design earlier submitted by Irvin as an unsolicited proposal.[31] The protest was denied on grounds that the Air Force was justified in turning Irvin's proposal down; [32] that Irvin's objections were untimely because "a protest relating to an alleged solicitation impropriety apparent on the face of the solicitation must be filed prior to the date for submission of offers;" [33] and that the record did not support Irvin's estoppel theory.[34]

Irvin then brought an action in the District Court.[35] There Irvin reasserted its claims of improper rejection [36] and estoppel,[37] and assailed the Air Force's decision to award the contract to Scot.[38] Early on, Irvin moved for a preliminary injunction,[39] which the court refused to grant.[40] The court felt that the Air Force properly discarded Irvin's proposal as deficient and that Irvin was not justified in relying upon alleged pre-solicitation representations by Air Force personnel as to acceptability of the Irvin product.[41] Nor, in the court's view, did

> the post-qualification concessions to Scot on terms of delivery and compensation constitute irregularities, at least of a magnitude to require that the award be set aside, even temporarily. The record explains rationally why cost and delivery terms had become negotiable: only one company was willing to supply the product the Air Force really wanted, and the Air Force consequently had no market to shop. The cost-plus arrangement thus became a cost-conscious alternative to the arbitrarily high fixed price that Scot, as a monopolist, could have commanded otherwise.[42]

Thereafter, on cross-motions for summary judgment,[43] the court, for "essentially

27. See note 11 *supra* and accompanying text.

28. See note 12 *supra* and accompanying text.

29. Rendon Affidavit, *supra* note 21, ¶ 5, App. 118.

30. The General Accounting Office is an arm of the Congress rather than the Executive. *Delta Data Sys. Corp. v. Webster,* 240 U.S.App.D.C. 182, 186 n. 1, 744 F.2d 197, 201 n. 1 (1984); *Scanwell Laboratories, Inc. v. Thomas,* 172 U.S. App.D.C. 281, 286 n. 5, 521 F.2d 941, 946 n. 5 (1975); *M. Steinthal & Co. v. Seamans,* 147 U.S. App.D.C. 221, 237, 455 F.2d 1289, 1305 (1971). Its bid protest procedures, 48 C.F.R. pt. 20 (1989), provide the means for a nonjudicial review of contract awards. *Scanwell Laboratories, Inc. v. Thomas, supra.* Resort to those procedures is not a precondition to judicial review, *id.; Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 388, 424 F.2d 859, 876 (1970), and "the GAO's advise is not binding upon the agency, much less upon the courts." *Delta Data Sys. Corp. v. Webster, supra,* 240 U.S.App.D.C. at 186, 744 F.2d at 201.

31. *Irvin Indus. Canada, Ltd.,* Comp. Gen. Dec. B–227375 (Sept. 24, 1987), 87–2 C.P.D. ¶ 294 at 4 (1987).

32. *Id.* at 3–4.

33. *Id.* at 4.

34. *Id.* at 4–5.

35. *Irvin Indus. Canada, Ltd. v. United States Air Force,* Civ. No. 88–3574 (D.D.C.) (filed Mar. 22, 1989).

36. Complaint, *Irvin Indus. Canada, Ltd. v. United States Air Force,* Civ. No. 88–3574 (D.D.C.) (filed Dec. 15, 1988) ¶¶ 48–50, 55–62.

37. *Id.* ¶¶ 52–53.

38. *Id.* ¶¶ 64–75.

39. Motion for Preliminary Injunction, *Irvin Indus. Canada, Ltd. v. United States Air Force,* Civ. No. 88–3574 (D.D.C.) (filed Dec. 15, 1988).

40. *Memorandum and Order, supra* note 16, at 1–5, App. 2–6.

41. *Id.* at 3–4, App. 4–5.

42. *Id.* at 4, App. 5.

43. Motion [of Air Force] for Summary Judgment, *Irvin Indus. Canada, Ltd. v. United States*

the reasons" persuading it to deny the preliminary injunction, ruled in favor of the Air Force.[44] It is from this disposition that Irvin appeals.

## II

 Irvin, as an offeror adversely affected by the Air Force's action, has standing to challenge the award of the contract to Scot.[45] To do so successfully, however, Irvin "bear[s] a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved clear and prejudicial violation of applicable statutes or regulations." [46] We find that Irvin has surmounted that hurdle.

The requirements to be satisfied by technical proposals respecting the parachute release were carefully detailed in documents accompanying the letter request communicated to prospective offerors.[47] Additionally, a pre-proposal conference was conducted by the Air Force to enable offerors to obtain answers to any questions they had about the acquisition process.[48] Hard-

ly could the Air Force have done more to promote understanding of the demands to be met, yet, by the Air Force's assessment, Irvin's proposal did not comply with all of them.[49] Irvin was accordingly notified that its proposal was unacceptable and that it could not be revised.[50] Both the General Accounting Office [51] and the District Court [52] agreed with the Air Force, and Irvin now concedes the point.[53]

The Federal Acquisition Regulation provides that "[a]ny proposal which modifies, or fails to conform to the essential requirements or specifications of, the request for technical proposals shall be considered nonresponsive and categorized as unacceptable," [54] and the contracting officer is directed to inform the offeror that no revision of the proposal will be entertained.[55] The principles demanding rejection of nonconforming proposals

> rest upon and effectuate important public policies. "Rejection of irresponsive bids is necessary if the purposes of formal advertising are to be attained, that is, to give everyone an equal right to compete for Government business, to secure fair prices and to prevent fraud."

Air Force, No. 88–3574 (filed Feb. 17, 1989); Motion of [Irvin Industries] for Partial Summary Judgment, *Irvin Indus. Canada, Ltd. v. United States Air Force,* Civ. No. 88–3574 (filed Feb. 24, 1989).

**44.** *Irvin Indus. Canada, Ltd. v. United States Air Force,* Civ. No. 88–3574 (April 19, 1989) (order), App. 1.

**45.** *Gull Airborne Instruments, Inc. v. Weinberger,* 224 U.S.App.D.C. 272, 275 & n. 2, 694 F.2d 838, 841 & n. 2 (1982); *Kentron Hawaii, Ltd. v. Warner,* 156 U.S.App.D.C. 274, 277, 480 F.2d 1166, 1169 (1973); *Wheelabrator Corp. v. Chafee,* 147 U.S.App.D.C. 238, 241, 455 F.2d 1306, 1309 (1971); *Scanwell Laboratories, Inc. v. Shaffer, supra* note 30. "A disappointed bidder that claims illegality in a procurement alleges an injury beyond its economic loss of the contract. The disappointed bidder may also claim injury to its right to a legally valid procurement process." *National Maritime Union v. Commander, Military Sealift Command,* 263 U.S.App.D.C. 248, 257, 824 F.2d 1228, 1237 (1987) (citations omitted).

**46.** *Kentron Hawaii, Ltd. v. Warner, supra* note 45, 156 U.S.App.D.C. at 277, 480 F.2d at 1169 (footnotes omitted). Accord, *Gull Airborne Instruments, Inc. v. Weinberger, supra* note 45, 224 U.S.App.D.C. at 275, 694 F.2d at 841; *Delta Data*

*Sys. Corp. v. Webster, supra* note 30, 240 U.S. App.D.C. at 189, 744 F.2d at 204; *Wheelabrator Corp. v. Chafee, supra* note 45, 147 U.S.App.D.C. at 241, 455 F.2d at 1312.

**47.** See App. 127–202.

**48.** See Letter Request, *supra* note 2, ¶ 3(b), App. 123; Pre-Proposal Conference, App. 203–211.

**49.** See Letter from Yvonne M. Craig, Contracting Officer, Directorate of Contracting and Manufacturing, San Antonio Air Force Logistics Center, to Irvin Industries Canada, Ltd., (attachment), App. 212.

**50.** *Id.,* App. 212.

**51.** See *Irvin Indus. Canada, Ltd., supra* note 31, 87–2 C.P.D. ¶ 294 at 4.

**52.** *Memorandum and Order, supra* note 16, App. 4–5.

**53.** Brief for Appellant at 33; Reply Brief for Appellant at 6.

**54.** 48 C.F.R. § 14.503–1(e)(2) (1988).

**55.** *Id.* § 14.503–1(g).

The requirement that a bid be responsive is designed to avoid unfairness to other contractors who submitted a sealed bid on the understanding that they must comply with all of the specifications and conditions in the invitation for bids, and who could have made a better proposal if they imposed conditions upon or variances from the contractual terms the government has specified. The rule also avoids placing the contracting officer in the difficult position of having to balance the more favorable offer of the deviating bidder against the disadvantages to the government from the qualifications and conditions the bidder has added.[56]

The prohibition on post-opening revision of bids rests on an equally solid foundation:

Allowing a bidder to modify [or the Government to accept] a nonresponsive bid when, upon opening the bids, it appears that the variations will preclude an award, would permit the very kind of bid manipulation and negotiation that the rule is designed to prevent. Otherwise bidders would be encouraged to submit nonresponsive bids on terms favorable to the government but subject to certain conditions, in the hope that if their bids were the top ones, they could then negotiate about and retain some of their proposed changes. In this way they could obtain a contract that they could not have received had they complied with the specification in the invitation for bids.[57]

We sustain the Air Force's determination that Irvin did not qualify for advancement to step two of the acquisition procedure.

After examining all of the technical proposals received, however, the Air Force erred grievously. Concluding that only Scot's proposal was acceptable, the Air Force dealt with Scot exclusively, despite Irvin's strenuous effort to stay in the running for the contract. It was in total elimination of Irvin and the other two unsuccessful offerors from the contest that the Air Force blundered fatally.

Contrary to the position shared by the Air Force and the District Court, Scot's proposal was also nonresponsive to the technical requirements of the solicitation. The Federal Acquisition Regulation tells us that "the word 'technical,'" as used in the context of two-step sealed bidding, "has a broad connotation and includes, among other things, ... special testing techniques."[58] The Air Force's request for technical proposals specified that a critical design review and demonstrations would be conducted 30 days after the contract was awarded and that during the review the contractor must demonstrate the capability of the release to meet the design, construction and performance characteristics contained in the purchase description.[59] This stipulation was as much a technical requirement as any other term of the solicitation,[60] and one

---

**56.** *Toyo Menka Kaisha, Ltd. v. United States,* 597 F.2d 1371, 1377 ([220] Ct.Cl. [210] 1979) (quoting *Prestex Inc. v. United States,* 320 F.2d [367,] 372 [162 Ct.Cl. 620 (1963)] (emphasis added)).

**57.** *Toyo Menka Kaisha, Ltd. v. United States, supra* note 56, 597 F.2d at 1377.

**58.** 48 C.F.R. § 14.01(a) (1988).

**59.** See note 11 *supra.*

**60.** The statement of work was an attachment to the letter request for technical proposals, which informed prospective offerors that "[t]he specific requirements" of the parachute release are detailed in the "Statement of Work," Letter Request, *supra* note 2, ¶ 1, App. 123, and "strongly advised that the requirement of the technical proposal as outlined in the Statement of Work be strictly complied with in all respects." *Id.*

¶ 6, App. 124. A set of instructions to prospective offerors reiterated that "[t]he requirements for the" parachute release "are in" four specifically-named "accompanying" documents, among which was the statement of work appended to the letter request. Technical Proposal Preparation Instructions for Automatic Mechanical Parachute Rip Cord Release ¶ 1.2, App. 127. The instructions also set forth "a recommended outline of areas we consider central to any proposal submitted," and listed "Statement of Work (SOW) requirements" under the heading "Technical." *Id.* The call for critical design review within 30 days was repeated in similar language in a technical overview of the parachute release, Overview of Requirement [*sic*] ¶ 2, App. 210, which was presented to attendees at the preproposal conference, Pre–Proposal Conference (minutes) ¶ 2, App. 204, among whom were representatives of all four submitters of technical proposals. App. 205.

that Scot's proposal did not satisfy.[61] Additionally, the request set a deadline for delivery of first article test reports,[62] again one with which Scot could not comply.

These shortcomings cannot be regarded as inconsequential. True it is that contracting officers must either give bidders "an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or waive the deficiency, whichever is to the advantage of the Government,"[63] but the deficits of the Scot proposal were far from minor.[64] The Federal Acquisition Regulation defines "[a] minor informality or irregularity" as "one that is merely a matter of form and not of substance," including "some immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders."[65] "The defect or variation is immaterial," the regulation further states, "when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired."[66]

Tested by these criteria, it is evident that the defects in Scot's proposal were quite material. Scot tendered its readiness for a critical design review within 170 rather than 30 days,[67] and for delivery of first article test reports within 526 days rather than 180 days.[68] These deviations from the terms of the solicitation were much more than a mere matter of form. Almost a century ago, the Attorney General ruled that a bid offering to finish by June 1, 1894, work which the invitation required completion of by December 31, 1893, had to be rejected as nonresponsive.[69] Down through the years since, the decisions have scrupulously observed the principle that a bid failing to meet delivery deadlines announced in the solicitation is non-responsive and must be rejected.[70] To boot, indulgence of Scot in these changes was clearly prejudicial to the three other offerors, who were not given a chance to reshape their proposals in light of the new timetable.[71]

**61.** Scot's master schedule, submitted at step one of the solicitation, indicated its ability to engage in a critical design review about 170 days after award of the contract. Letter from Samuel Levin, Vice President, Quality Assurance and Administration, Scot, Incorporated, to Directorate of Contracting and Manufacturing, San Antonio Air Logistics Center (May 29, 1987) at 1, App. 61.

**62.** See note 12 *supra* and accompanying text.

**63.** 48 C.F.R. § 14.405 (1989).

**64.** *Id.* (giving examples of "minor informalities or irregularities").

**65.** *Id.*

**66.** *Id.*

**67.** See note 11 *supra* and accompanying text.

**68.** See note 12 *supra* and accompanying text.

**69.** 20 *Op. Att'y Gen.* 496 (1892).

**70.** *Sierra/Misco, Inc.,* Comp.Gen.Dec. B–216147 (Sept. 18, 1984), 84–2 C.P.D. ¶ 320, at 2 (where invitation for bids specified delivery within 45 days, bid stating that one-third of the items would be delivered within 60 days was nonresponsive); *Arvie Mfg. & Supply Co.,* Comp.Gen. Dec. B–210114 (Jan. 4, 1983), 83–1 C.P.D. ¶ 10, at 2 (where invitation called for delivery of partial quantity of wrenches within 180 days after award and balance within 210 days after award, bid offering delivery of entire quantity within 210 days after award was nonresponsive); *Sunoptic, Inc.,* Comp.Gen.Dec. B–194722 (May 14, 1979), 79–1 C.P.D. ¶ 351, at 2 (contracting officer properly rejected as nonresponsive bid offering delivery in four to six weeks under solicitation requiring a 14–day delivery); 36 Comp.Gen. 181, 183 (1956) ("[t]o award a contract to a low bidder without regard to the terms and conditions of delivery advertised would discriminate against other bidders who may well have included overtime pay and other additional costs in order to meet the deadline").

**71.** In decisions affirming awards to nonresponsive bidders, the critical consideration has been a finding that, under the circumstances, acceptance of the nonconforming bid did not prejudice other bidders. E.g., *Singleton Contracting Corp.,* Comp.Gen.Dec. B–211259 (Aug. 29, 1983), 83–2 C.P.D. ¶ 270 at 3 (award proper where each of two bids was nonresponsive for same material nonconformity and acceptance resulted in a contract satisfying Government's needs). "The test of prejudice ... is whether it is reasonably clear that another bidder, given the benefit of the similarly relaxed requirement ... would have bid in such a manner that it would have been in line for the award." *E.F. Matelich Constr. Co.,* Comp.Gen.Dec. B–207600 (Sept. 28, 1982), 82–2 C.P.D. ¶ 291 at 3.

When it became known that Scot's design was the only one that satisfied the specifications advertised, the contracting officer consulted Air Force engineers to ascertain whether any other product offered was capable of being made compliant, but was informed that all of them had major discrepancies that would have necessitated significant redesign.[72] Irvin and FXC Corporation, however, have insisted that had they been granted the same concessions yielded to Scot, they would have offered a new and different design conforming in all respects to the purchase description included in the request for technical proposals.[73] So far as we are aware the Air Force does not contest these representations. Even if the Air Force had disputed the ability of the two companies to bring their respective products in line, the issue would have precluded the District Court from disposing of this case on summary judgment.[74]

Indeed, none of the offerors complied with the schedule set forth in the request for proposals,[75] and it seems to be common ground that it was well-nigh impossible for any of them to do so. As Scot was later to point out, "[i]t is not possible to be ready for a CDR within 30 days ARO for a device which does not exist and must meet the detailed solicitation requirements."[76] Other offerors, too, observed that the request for technical proposals sought to acquire too much in too short a period of time.[77]

Though fully advertent to this nonconformity in Scot's technical proposal,[78] the Air Force labeled it "acceptable" and proceeded to negotiation with Scot alone. The Air Force has since explained that "the schedule did not affect the technical acceptability of individual design proposals," on

72. Craig Affidavit, *supra* note 21, ¶ 6, App. 231.

73. Affidavit of Donald B. Mauchlen ¶ 5, App. 54; Chevrier Affidavit, *supra* note 11, ¶ 5, App. 59–60. See also Affidavit of Felix Darryl Powers ¶ 14, App. 27 ("it is my professional opinion that Irvin had the technical capability to design and build in production quantities a mechanical release which conforms in all respects to" the purchase description, and, "[a]ssuming that Irvin had the interest in doing so from a business standpoint, its proposal under the 1987 competitive procurement was reasonably susceptible to being modified as a result of negotiations so that it would have been technically acceptable" thereunder).

74. Fed.R.Civ.P. 56(c).

75. Rendon Affidavit, *supra* note 21, ¶ 19, App. 122; Craig Affidavit, *supra* note 21, ¶ 7, App. 231.

76. Scot Letter, *supra* note 18, at 1, App. 61.

77. FXC Corporation, an offeror, explained the dilemma:

The RFTP required, among other things, that critical design review ("CDR") occur within 30 days of the date of award of contract, and that the contract awarded would be a fixed-price basis. The RFTP also provided that a contractor's first article test reports were to be delivered within 180 days of contract award. These provisions, particularly the schedule for critical design review and completion of contractor first article testing effectively required a would-be contractor to offer a preexisting design, that is, which was complete as of the date of contract award.

Chevrier Affidavit, *supra* note 11, ¶ 3, App. 59. Irvin commented:

The solicitation calls for commencement of deliveries 180 days after approval of first article test and completion of delivery of the entire 7,500 within 240 days after approval of first article test. While Irvin, as the only existing manufacturer of mechanical parachute opening devices, is fully capable of producing at what is tantamount to mass production levels, that manufacturing approach would require acquisition of substantial special tooling and greater advance purchase of materials and components. This would result in substantial additional production costs and a commensurately higher unit price possibly on the order of magnitude of two or three times the unit cost for a more extended schedule. Irvin's Proposal sought to reduce unit prices by eliminating necessary mass production costs. Irvin assumed that the delivery schedule would be a matter of negotiation during which Irvin could outline to the Air Force the magnitude of the price/schedule tradeoffs involved in the different levels of production quantities (delivery over slightly more than a year versus ninety days), particularly since deployment of the full 7,500 opening devices within three months would likely be difficult.

Analysis, *supra* note 12, ¶ 5, App. 219. The Air Force admits that its delivery schedule was "somewhat unrealistic," Craig Affidavit, *supra* note 21, ¶ 7, App. 231, a criticism we consider rather mild.

78. Rendon Affidavit, *supra* note 21, ¶ 19, App. 122; Craig Affidavit, *supra* note 21, ¶ 7, App. 231.

account of which "no offeror was eliminated on only this basis." [79] Rather, the Air Force said, "[a]t step one, the only basis for complete proposal rejection was noncompliance with the technical requirements of the purchase description." [80] Then, once the Air Force found itself "with only one acceptable technical proposal," it "determined to use negotiated procurement procedures in accordance with FAR guidance." [81] We accept the Air Force's reasoning that under the circumstances it might, in its discretion, elect negotiation in lieu of a new solicitation of proposals. But it is clear enough that the Air Force violated the Federal Acquisition Regulation when it confined the negotiation to Scot.

### III

None of the four companies submitting technical proposals on the parachute release survived the first stage of the two-step bidding process. None of the proposals met the deadline for critical design review. None complied with the Air Force's schedule for delivery. None but Scot's conformed to the technical specifications of the release sought. It follows that all of the proposals were nonresponsive in some degree, and that none properly could be rated

"acceptable" or, without more, advanced to step two.[82]

That the Air Force seemingly recognized, for after examining the step-one proposals the contracting officer abandoned sealed bidding and went ahead with negotiation.[83] That procedure, properly conducted, was entirely appropriate. "When step one results in no acceptable technical proposal or only one acceptable technical proposal," the Federal Acquisition Regulation states, "the acquisition may be continued by negotiation," [84] but that did not authorize negotiation exclusively with Scot. With exceptions not pertinent here, full and open competition, to the extent and in a manner practicable, is the general requirement in negotiation as it is in sealed bidding.[85] "Under [the] rule of 'fair treatment,' an agency cannot disregard the material changes of its RFP for only one offeror as this would be tantamount to not giving all offerors a fair and equal opportunity to compete on the same basis." [86] The Federal Acquisition Regulation provides specifically that when the acquisition process is converted from sealed bidding to negotiation, all who have submitted bids in response to the agency's invitation must be given a reasonable opportunity to negotiate.[87] A recent

---

**79.** Craig Affidavit, *supra* note 21, ¶ 7, App. 231.

**80.** *Id.,* App. 231.

**81.** *Id.,* App. 231.

**82.** Even if Scot's proposal had complied fully with the terms of the solicitation, the Air Force could not have proceeded straight to step two. The Federal Acquisition Regulation provides:

> The contracting officer may proceed directly with step two if there are sufficient acceptable proposals to insure adequate price competition under step two, and if further time, effort and delay to make additional proposals acceptable and thereby increase competition would not be in [*sic*] Government's interest. If this is not the case, the contracting officer shall request bidders whose proposals may be made acceptable to submit additional qualifying or supplemental information.

48 C.F.R. § 14.503–1(f)(1) (1989). There obviously can be no price competition when there is but one proposal. Moreover, there was no formal determination as to whether any of the rejected proposals could have been made acceptable, and certainly no offeror other than Scot was afforded an opportunity to press on for the contract.

**83.** Craig Affidavit, *supra* note 21, ¶ 7, App. 231.

**84.** 48 C.F.R. § 14.503–1(i) (1989).

**85.** See 10 U.S.C. §§ 2304(a)–(b), 2305(a), 2317–2319 (West Supp.1990); 48 C.F.R. §§ 6.101–6.-102 (1989).

**86.** *Minnesota Mining & Mfg. Co. v. Shultz,* 583 F.Supp. 184, 189–190 (D.D.C.1984).

**87.** *Id.* § 15.103(a), providing:

> When the agency head has determined, in accordance with 14.404–1(e)(1), that an invitation for bids is to be cancelled and that use of negotiation is appropriate to complete the acquisition, the contracting officer may negotiate without issuing a new solicitation subject to the following conditions—
> (a) Prior notice of intention to negotiate and a reasonable opportunity to negotiate have been given by the contracting officer to each responsible bidder that submitted a bid in response to the invitation for bids....

Conversion from sealed bidding to negotiation is a decision to be made by the agency head, not a contracting officer. *Id.*

decision of the General Accounting Office [88] well illustrates the operation of this provision.

In *Cemco Products, Inc.,*[89] an agency invited bids for insulated pipe and fittings to be used in providing water and sewer services. The invitation required samples for testing to determine compliance with specifications listed therein and warned that failure of samples to conform thereto would result in rejection of the bid. Cemco was one of two bidders, and the samples supplied by both bidders were nonconforming, whereupon the contracting officer called for new samples and indicated that no other change in the bids would be allowed. Cemco's competitor submitted a new sample which passed the testing, but Cemco protested to the General Accounting Office instead. Cemco claimed that the contracting officer's request for new samples was improper and argued that if both bids were nonresponsive, the agency should have cancelled the invitation for bids and either resolicited or converted the solicitation to a negotiated procurement. The agency's response was that the contracting officer, faced with two nonconforming bids and insufficient time to cancel and reprocure, chose in effect to convert the procurement to a negotiated one. The agency admitted that the contracting officer erred in failing to secure a determination from the agency head before negotiat-

ing but argued that the error did not prejudice Cemco. GAO sided with Cemco:

> We think that what [the agency] did here does not meet the test for conversion from sealed bidding to negotiation. FAR §§ 14.404–1(c)(6) & (e) and 15.103 provide that where no responsive bids are received from responsible bidders, an IBF may be canceled and the procurement completed through the use of negotiations, so long as all responsible bidders under the original IBF are given prior notice and a reasonable opportunity to negotiate. In our view, the protester was not given a reasonable chance to negotiate.[90]

In the case at bar, Irvin was given no such chance whatsoever.

The Air Force contends that it stood on solid ground in negotiating schedule and price revisions with Scot alone because the proposals of the three remaining offerors were appropriately rejected as nonresponsive to the technical specifications of the parachute release. We are unable to agree. In its solicitation, the Air Force set deadlines for critical design review and first article test reporting. The Air Force also announced therein that its step-one "technical evaluation" would involve four factors, including "technical" and "schedule."[91] It gave no indication that any factor would be accorded more or less

§ 14.404–1(e)(1). In the case before us, the contracting officer, not the agency head, made that determination, Craig Affidavit, *supra* note 21, ¶ 7, App. 231. In addition to that, it does not appear that the invitation for bids was ever formally cancelled. Surely, these departures from prescribed procedures cannot be permitted to work to Irvin's disadvantage. See *Cemco Prods., Inc.,* Comp.Gen.Dec. B–234147 (May 23, 1989), 89–1 C.P.D. ¶ 491 at 4–5. Rather, the requirement of competitive negotiation imposed by § 15.103(a) obtained just as it would have had the Air Force complied with the rules.

**88.** While decisions of the General Accounting Office are not binding in subsequent judicial proceedings, see note 30 *supra,* we have acknowledged that agency's "accumulated experience and expertise." *Delta Data Sys. Corp. v. Webster, supra* note 30, 240 U.S.App.D.C. at 186, 744 F.2d at 201 (quoting *M. Steinthal & Co. v. Seamans, supra* note 30, 147 U.S.App.D.C. at

237, 455 F.2d at 1305). See also *Scanwell Laboratories, Inc. v. Thomas, supra* note 30, 172 U.S.App.D.C. at 286 n. 5, 521 F.2d at 946 n. 5; *Wheelabrator Corp. v. Chafee, supra* note 45, 147 U.S.App.D.C. at 245–248, 455 F.2d at 1313–1317. We therefore "regard the assessment of the GAO as an expert opinion, which we should prudently consider but to which have no obligation to defer." *Delta Data Sys. Corp. v. Webster, supra* note 30, 240 U.S.App.D.C. at 186, 744 F.2d at 201.

**89.** *Supra* note 87.

**90.** 89–1 C.P.D. ¶ 491 at 4–5. That was because bidders in the situation presented, were free to revise their bids as they saw fit, and could not be confined to submission of new samples. *Id.* at 4–5.

**91.** Letter Request, *supra* note 2, ¶ 7, App. 124.

weight than any others,[92] or that any would be ignored or altered. Receiving no offer meeting both the technical specifications and the time restraints set forth in the solicitation, the Air Force felt that the former outweighed the latter and became dominant.[93]

The Air Force's action ran contrary to applicable provisions of the Federal Acquisition Regulation, which declares that "[e]valuations shall be based on the criteria in the request for proposals,"[94] that "[a]ny proposal which ... fails to conform to the essential requirements or specifications of ... the request for technical proposals shall be considered nonresponsive and categorized as unacceptable,"[95] and that "[t]o be considered for award, a bid must comply in all material respects with the invitation for bids."[96] These unambiguous provisions demand that responsiveness, and thus eligibility for award of a contract, be premised on an offeror's full compliance with all material requirements of the solicitation.

## IV

When the Air Force invited technical proposals for the parachute release, it envisioned an acquisition of a satisfactory product within a relatively short space of time. As things turned out, however, that did not occur; no one offered a product meeting both of those objectives. It then became evident that either the technical specifications or the schedule requirements would have to be relaxed; put another way, the Air Force was forced to decide whether it would accept a compromise product that it could obtain quickly, or whether it would insist upon a fully conforming product the development and production of which it would have to await. The schedule concessions granted Scot effectuated a decision to take the latter course, but the Air Force reshaped the contest in such manner that only Scot could win. Because the Air

Force erred in doing so, we reversed the judgment of the District Court with instructions to require the Air Force to proceed, if at all, with a new contract solicitation.

---

**92.** Contrastingly, in *Delta Data Sys. Corp. v. Webster, supra* note 30, 240 U.S.App.D.C. at 184, 744 F.2d at 199, the agency similarly listed four factors to be considered, but qualified each by assigning to it a percentage representing its weight in the evaluative process.

**93.** See text *supra* at notes 21–22.

**94.** 48 C.F.R. § 14.503–1(e)(1) (1989).

**95.** *Id.* § 14.503–1(e)(2).

**96.** *Id.* § 14.301(1).