TECHNOLOGY FOR COMMUNICATIONS INTERNATIONAL, INC., Plaintiff,

v.

Lawrence GARRETT, III, et al., Defendants.

Civ. A. No. 91–2993 (CRR).

United States District Court, District of Columbia.

Feb. 4, 1992.

Howard Lipper, Dale Church of Pillsbury, Madison and Sutro, Washington, D.C., for plaintiff.

Jay B. Stephens, U.S. Atty., John D. Bates and Patricia Carter, Asst. U.S. Attys., Dist. of Columbia, for defendants.

Richard F. Silber and James J. Hennigan of Gardner, Carton & Douglas, Washington, D.C., for intervenor Andrew Canada, Inc.

## OPINION

CHARLES R. RICHEY, District Judge.

Pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.*, and the Competition in Contracting Act, 10 U.S.C. § 2304, *et seq.*, Plaintiff Technology for Communications International, Inc. ("TCI") protests the Defendant Navy's award of a contract for 15 dual mode high frequency antennae, with options for 80 or more, to Defendant–Intervenor Andrew–Canada, Inc. ("Andrew"). Plaintiff contends that the Navy violated procurement regulations by accepting a product which did not conform to the contract specifications. Plaintiff also argues that the Navy improperly

refused to stay performance under the contract upon receiving notification of the protest. With the agreement of the parties, the Court consolidated the Plaintiff's request for preliminary injunction with a hearing on the merits pursuant to Fed. R.Civ.P. 65(a)(2). *See* Order, *TCI, Inc. v. Garrett*, Civ. 91–2993 (D.D.C., Nov. 20, 1991). Upon consideration of the Plaintiff's request for permanent injunction and other relief, the opposition of the Defendant and the Defendant–Intervenor thereto, the applicable law and the record herein, the Court shall deny the Plaintiff's request for permanent injunction. This Opinion shall constitute the Court's findings of fact and conclusions of law as required by Fed. R.Civ.P. 52(a).[1]

## BACKGROUND

The Navy issued RFP No. N00102–91–R–0020 on November 6, 1990 seeking a firm fixed-priced requirements contract for dual mode high frequency antennas for one base year, with options available to the Navy for four (4) subsequent years. In this negotiated procurement, the Navy promised to evaluate all offers "for technical acceptability." *See* Section M of the RFP, Attached as Exhibit A to Plaintiff's Motion for Temporary Restraining Order. The Navy advised that proposals "that do not conform to the requirements of the solicitation may be rejected without further evaluation, deliberation or discussion." *Id.* The contract would be awarded to the "low priced, technically acceptable offer." *Id.*

The antenna sought by the Navy was not an "off-the-shelf" item. However, the Navy determined that a full-scale research and development effort was unnecessary given the available technologies. *See* Courtland Deposition at 19, 27. Thus, the Navy required each offeror to demonstrate that it could use existing technologies to meet the Navy's needs at the least possible cost to the Government. Specifically, offerors were required to demonstrate their capability to meet the technical specifications established by the Naval Electronics

---

1. By agreement of the parties, the Court shall furnish this Opinion to counsel prior to filing in the public record in order that counsel can suggest appropriate redactions of any confidential, proprietary or other protected information contained herein. *See* Praecipe, *TCI, Inc. v. Garrett*, filed Jan. 22, 1992.

Systems Center, Vallejo. *See* Purchase Specification (Rev. A) for Dual Mode High Frequency Antenna, Attached as Exhibit B to Plaintiff's Motion for Temporary Restraining Order. Each technical proposal had to be "specific, detailed and complete" so as to "enable Government engineering personnel to make a thorough evaluation and arrive at a sound determination as to whether or not the proposed equipment will meet the requirements of the Government." RFP, Section L, Attached as Exhibit A to Plaintiff's Motion. The Navy would confirm the successful offeror's ability to provide a product according to the terms and conditions of the contract through First Article Testing; failure to "pass" First Article Testing would result in default under the contract. *See* RFP, Section E, Attached as Exhibit A to Plaintiff's Motion. The Navy received three proposals in response to the RFP. One proposal was deemed technically unacceptable at the outset while the proposals submitted by the Plaintiff TCI and the Defendant–Intervenor Andrew were considered technically acceptable.

Two specifications are at issue here. Specification 3.7.11(a) requires offerors to provide an antenna which has a "power gain across band width not less than 6dbi." *See* Exhibit B at p. 18, Plaintiff's Motion for Temporary Restraining Order. Andrew stated that it would "comply" with this specification and presented a chart listing the gain over average ground for Mode 1 at a high take-off angle and for Mode 2 at a low take-off angle.[2] TCI claimed that it was "fully compliant" at "6dbi or greater, 2–30 MHz" and also included a table illustrating the frequency characteristics of a representative antenna.[3]

Specification 3.7.11(e) requires all offerors to provide antennas with an "omni-directional pattern circular within 2dB."

*Id.* at Exhibit B, p. 18. Both TCI and Andrew warranted that the product would be omni-directional within 2dB. Andrew merely stated that it would "comply" with Specification 3.7.11(e)[4] while TCI stated that it was "fully compliant" and also referenced an appendix submitted along with its proposal.[5] The technical evaluation team thereafter advised both TCI and Andrew to submit further materials, including computer-generated models displaying the equipment's respective radiation patterns, for purposes of evaluating each offeror's compliance with the 3.7.11(e) requirements. *See* Chu Deposition at 23–24; Triano Deposition at 21.

At the close of the evaluations, the technical evaluation team found both proposals to be technically acceptable. *See* Chu Dep. at 21. Upon receiving word from the technical evaluation team that both offerors could comply with the specifications, the contracting officer awarded the contract to Andrew, the lower-priced offeror, on August 20, 1991. *See* Exhibit F, Plaintiff's Motion. Plaintiff filed a protest with the GAO on August 30, 1991. *See* Exhibit J, Plaintiff's Motion. The Navy did not suspend performance on the contract because it claimed that it did not receive notification of TCI's protest from the GAO within the ten day period established by 31 U.S.C. § 3553(d)(1).

Despite the fact that Plaintiff's protest was pending before the GAO, Plaintiff filed a Complaint and Motion for Temporary Restraining Order in this Court on November 18, 1991. *See* Complaint. At a Hearing on the temporary restraining order, the parties agreed to maintain the status quo *pendente lite* such that the Navy would not award any options under the contract, thereby mooting Plaintiff's motion for emergency injunctive relief.

2. *See* Andrew's Engineering Response to Solicitation, Attached as Ex. B to Plaintiff's Memorandum in Support of a Permanent Injunction.

3. *See* TCI Proposal No. 14513, Attached as Exhibit 1 to Navy's Nov. 27, 1991 Reply to TCI Protest Before the GAO, GAO Administrative Record. This material is also contained in the "handout" submitted to the Court by counsel for Defendant Garret at the Hearing on the merits.

4. *See* Andrew's Engineering Response to Solicitation, Attached as Ex. B to Plaintiff's Memorandum in Support of a permanent Injunction.

5. *See* TCI Proposal No. 14513, Attached as Exhibit 1 to Navy's Nov. 27, 1991 Reply to TCI Protest Before the GAO, GAO Administrative Record.

*See* Order, *TCI, Inc. v. Garrett,* Civ. 91–2993 (Nov. 19, 1991). The parties also agreed that the Court should combine Plaintiff's request for preliminary injunction with a consolidated hearing on the merits, pursuant to Fed.R.Civ.P. 65(a)(2), after the GAO rendered its decision. *Id.*[6]

The GAO granted Plaintiff TCI's protest on December 13, 1991. The GAO found that the Navy did not have a reasonable basis to accept Andrew's proposal in the face of data which GAO perceived to reveal Andrew's inability to meet RFP Specification 3.7.11(e). *See* GAO Opinion at 5. Alternatively, the GAO found that even if *both* TCI and Andrew submitted technically unacceptable offers, the Navy should amend the RFP and resolicit under a relaxed 3.7.11(e) specification. *See Id.* at 5, n. 3. The GAO advised the Navy to either amend the RFP so that all offerors could compete on the revised specifications, or to award the contract, as currently drafted, to the Plaintiff. *Id.* at 6. The Court now

reviews the Plaintiff's claims on the basis of the record before the GAO, as supplemented by the depositions of the technical evaluation panel members and the pleadings herein. *See* Order, *TCI, Inc. v. Garrett,* Civ. 91–2993 (D.D.C., Nov. 20, 1991).[7]

## ANALYSIS

■ As a disappointed bidder for a government contract, TCI may challenge the contract award in this Court. *See Irvin Industries Canada, Ltd. v. U.S. Air Force,* 924 F.2d 1068, 1072 (D.C.Cir.1990). The Court may not substitute its judgment for that of the contracting agency and must accord special deference to an agency's technical determinations. *See, e.g., M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971).[8] However, this deference to an agency's technical evaluations does not override the Court's "duty to overturn an agency procurement decision where a disappointed bidder meets its heavy burden of showing that 1) the procurement official's decision on matters

6. The Court advised the parties that the GAO's decision was not binding in this matter, and that the GAO merely would be providing an opinion for purposes of evaluating the procurement herein. *See* Tr. of Nov. 19, 1991 Hearing on the Temporary Restraining Order at 21. This procedure comports with the law in this Circuit. *See Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 201 (D.C.Cir.1984) ("we regard the assessment of the GAO as an expert opinion, which we should prudently consider but to which we have no obligation to defer").

7. Plaintiff has submitted the declaration of Dr. Ron Wilensky to buttress its claim that its product met the RFP's specifications. Defendant–Intervenor challenges the admissibility of this declaration in light of the Court's November 20, 1991 ruling and the telephonic status conference on December 2, 1991. Defendant–Intervenor is correct. The Court intended to limit the record to the materials before the GAO and the three depositions of the technical panel members. *See* Tr. Nov. 19, 1991 Hearing at 18–19. At the November 19, 1991 Hearing, Plaintiff's counsel withdrew his request for an additional opinion witness at the Hearing on the merits and the Court advised that the record would be closed. *See* Tr. Nov. 19, 1991 Hearing at 27–28. Moreover, the Court predicated its willingness to accept additional materials on whether the GAO would include and consider such material in the record for decision. *See* Tr. of Dec. 2, 1991 Telephonic Status Conference at 9. Because the GAO refused to accept these additional materi-

als into the GAO record, the Court's prohibition against expanding the record stands. In any event, the declaration of Dr. Wilensky is not material given the Court's disposition of the issues herein.

8. TCI contends that deference to the technical evaluation team is unjustified because the team members do not possess sufficient knowledge and expertise in the HF antenna field. *See* Memorandum in Support of Plaintiff's Request for Permanent Injunction at 10–11. The Court must reject this argument. First, the agency, and not the protestor, is in the best position to determine which qualifications are necessary for the personnel on the technical evaluation team. Second, the record indicates that the members of the evaluation team had sufficient experience to participate in the procurement. Although Mr. Courtland has no direct experience with dual mode high frequency antennas, he is the head of the Antenna Systems Branch for the Naval Computer and Telecommunications Command and has a knowledge of the Navy's requirements under the contract. *See* Courtland Dep. at 5–8. Mr. Chu is an electronic engineer associated with the Naval facilities at Vallejo and has experience in the HF antennas field. *See* Chu Dep. at 7–13. Mr. Triano is also an electrical engineer and has installed high frequency antenna of this type for the Navy. *See* Triano Dep. at 5–12. Lastly, and most importantly, the technical evaluators selected by the Navy for this procurement are certainly more qualified to opine on the technical merit

committed primarily to his own discretion had no rational basis or 2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Irvin Industries, supra,* 924 F.2d at 1072 (citing *Minnesota Mining & Manufacturing Co. v. Schultz,* 583 F.Supp. 184, 187 (D.D.C.1984)). *See also Scanwell Laboratories, Inc. v. Thomas,* 521 F.2d 941, 946 n. 5 (D.C.Cir.1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976); *Kentron Hawaii, Limited v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973).

In the instant protest, TCI makes four basic claims. First, TCI contends that the Navy irrationally awarded the contract to a non-responsive proposal due to Andrew's failure to provide adequate detail about the product and submission of information which illustrated the product's inability to meet the contract specifications. According to TCI, awarding a contract to a non-responsive offeror violates 10 U.S.C. § 2305(b)(4)(B).[9] *See* Complaint at ¶ 10–15. Second, TCI contends that the Navy violated Federal Acquisition Regulations (FAR) § 15.606(a)[10] and § 15.606(c)[11] by awarding the contract to Andrew under relaxed specifications without amending the solicitation in order to enable TCI to compete under the same relaxed specifications. *See* Complaint at ¶ 15–23. Third, TCI contends that it is the only responsive offeror and is therefore entitled to contract award. *See* Memorandum in Support of Plaintiff's Request for a Permanent Injunction and an Order Directing Award of a Contract to TCI at 2. Fourth, TCI contends that the Navy violated 31 U.S.C. § 3553(d)(1)[12] by refusing to stay performance of the contract upon receiving notification of the pro-

test before the GAO. *See* Complaint at ¶ 24–29.

A. *The Agency Made a Rational Determination Regarding the Technical Acceptability of the TCI and Andrew Proposals and Did Not Relax the Specifications in the RFP for Either Offeror.*

■ Upon further review, the Court finds that the agency rationally evaluated the proposals and did not run afoul of applicable law and regulations. The Plaintiff's claim that Andrew did not submit enough information to enable the technical evaluation team to evaluate the proposal lacks merit. Although the GAO chided Andrew for failing to explain how its product would comply with the specifications, it did not base its decision sustaining TCI's protest on this ground. *See* GAO Opinion at 2. Contrary to Plaintiff's claims in this case, the deficiency in Andrew's proposal identified by the GAO is a not sufficient basis upon which the Court can find that Andrew's proposal was nonresponsive. Under the clear terms of the RFP, the agency was not obligated to reject a proposal for failure to provide specific responses for each element of the specifications. Section L of the RFP arguably envisions a situation in which an offeror supplies insufficient technical information, by providing that "offers which do not present sufficient information to permit complete technical evaluation by the Government *may* be rejected." (emphasis added).

Any attempt to find the TCI proposal sufficiently detailed and the Andrew proposal fatally vague is doomed to failure.

---

of the proposals than the Court, the GAO or counsel.

**9.** This statute provides, in relevant part: "the agency shall award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the United States, considering only cost or price and other factors included in the solicitation."

**10.** The FAR § 15.606(a) provides that "when, either before or after receipt of proposals, the Government changes, relaxes, increases or otherwise modifies its requirements, the contracting officer shall issue a written amendment to the solicitation." *See* 48 C.F.R. § 15.606 (1991).

**11.** FAR § 15.606(c) provides that: "If the proposal considered to be most advantageous to the Government (as determined according to the established evaluation criteria) involves a departure from the stated requirements, the contracting officer shall provide all offerors an opportunity to submit new or amended proposals on the basis of the revised requirements *provided,* that this can be done without revealing to the other offerors the solution proposed in the original departure or any other information that is entitled to protection...."

**12.** *See* note 21, *infra,* for the text of this provision.

Although TCI explicitly referenced an appendix in its response to Specification 3.7.11(e), *see* GAO Opinion at 2, the mere mention of the appendix does not render TCI responsive and Andrew non-responsive. In its initial submission, Andrew furnished the same type of background information about the available Spira–Cone product line as TCI submitted for its antennas. *See* GAO Record, Andrew Proposal Section III, Attachment 1 (commercial description of Type 3000 Series HF Broadband Dual–Mode Spira–Cone Antennas). If anything, the record indicates that both the TCI and Andrew proposals lacked specificity. TCI's response to the inquiry for Specification 3.7.11(e) merely paraphrases the specification and makes a vague reference to TCI product-line brochures. Thus, TCI's proposal also failed to *"explain* how [the offeror] complies ... or takes exception" for each numbered paragraph. *See* RFP, Section L (emphasis added). It is also significant that the agency requested *both* Andrew and TCI to submit further technical information, thereby evidencing that the agency found both proposals to be lacking in their ability to "clearly and fully demonstrate that the prospective contractor has a thorough knowledge and understanding of the requirements and has valid practical solutions for any technical problems" with respect to Specification 3.7.11(e). *Id.* Thus, to the extent that a specific and detailed proposal was a sine qua non for technical acceptability, the agency waived this requirement for both offerors, and TCI was in no way prejudiced thereby. *See, e.g., Louisiana Dock Services, Inc.,* 91–1 CPD ¶ 206 (Feb. 25, 1991) (denying protest where agency waived delivery date requirement for both offerors for lack of competitive prejudice).

The Court must also reject TCI's attempt to interpret Andrew's technical data as a means to demonstrate Andrew's inability to produce an antenna meeting the specifications.[13] Although the one-page contemporaneous "record" of the technical evaluation team's deliberation process does not completely articulate the basis of the technical evaluations,[14] the deposition testimony of the three members of the evaluation team evidences the rationality of the agency's award decision and upends the GAO's decision.

The GAO accepted TCI's contention that the agency overlooked critical discrepancies in the data provided by Andrew. On this basis, the GAO concluded that the agency irrationally awarded the contract.[15] *See* GAO Opinion at 5 ("we find that the record contains no reasonable basis for the agency to select Andrew in the face of nonconformance contained in data provided by the awardee"). The GAO erred in this regard, however. The record indicates that An-

---

13. Although the parties focus primarily on Andrew's ability to comply with Specification 3.7.11(e) in light of the test data provided by Andrew, the GAO found that the test data also forms the basis of TCI's claim that Andrew cannot meet Specification 3.7.11(a). *See* GAO Opinion at 6, n. 4. In this action, TCI has presented no basis upon which to find that Andrew does not comply with Specification 3.7.11(a) other than the test data and the written submissions in Andrew's proposal. *See* Plaintiff's Memorandum in Support of Plaintiff's Request for a Permanent Injunction and Order Directing Award of a Contract to TCI at 9. Thus, TCI's attack with respect to both deficiencies relies on TCI's claim that the Navy irrationally evaluated the data submitted by Andrew.

14. Neither party contends, on the basis of *S–Cubed, A. Div. of Maxwell Laboratories, Inc.,* 91–1 CPD ¶ 571 (June 17, 1991) and its progeny, that the agency's contemporaneous record was so inadequate as to invalidate the procurement. Moreover, the GAO did not find that the agency's failure to maintain an adequate contempo-

raneous record, standing independently of the alleged discrepancies in Andrew's technical data, was a sufficient basis upon which to invalidate the procurement. In any event, because the agency record has been supplemented with the depositions of the technical evaluation team by the agreement of all parties, this Court does have a sufficient basis upon which to evaluate the agency's decision.

15. In its protest to the GAO, TCI pointed to numerous deviations from Specification 3.7.11(e). *See* Exhibit K to Plaintiff's Memorandum in Support of Temporary Restraining Order. Andrew itself itemized deviations from the 2dB requirement in its May 13, 1991 submission to the technical evaluation panel. *See* Exhibit D at 8–9, Plaintiff's Memorandum in Support of Temporary Restraining Order. Andrew's data also revealed the inability of its current product to meet Specification 3.7.11(a). *See Id.* (figs. 4, 8, 12).

drew did explain the variance in the computer-generated data by referencing the results of tests conducted in Utah. *See* Andrew's May 13th Submission to the Navy, Attached as Ex. D to Plaintiff's Memorandum in Support of Temporary Restraining Order. Specifically, Andrew explained the deficiencies in the performance of the computer-generated model, telling the agency that:

> In reality, as demonstrated during the recent test carried out in Utah, ground reflections reduce this negative effect and the summation of the total field, comprising direct and reflected, horizontal and vertical field components, as seen by the airborne beacon, produces an omni-directional radiation pattern free of nulls.

*Id.*, Section 4.1.2 at 5. The GAO overlooks Andrew's assessment of the Utah tests in finding that the agency "discounted the awardee's data showing theoretical noncompliance with the specifications." GAO Opinion at 5. This oversight is critical because the technical evaluation team relied on Andrew's assessment of the Utah tests in concluding that Andrew was capable of complying with the specifications.

> I recall the Andrew proposal stating that although their computer generated models are a good indication in actual tests—and I recall that they were in Utah—that when they did the actual tests the null shown in the azimuth weren't there in the actual tests because of ground reflections.

*See* Triano Dep. at 19.[16] Thus, even assuming, *arguendo*, that the computer-generated data are dispositive of an offeror's ability to meet the specifications, Andrew

has presented a sufficient basis upon which to believe that its product could meet the specifications.

The GAO also erred in concluding that the agency was bound to make its determination of technical acceptability on the basis of the data submitted with the proposals. As the technical evaluators noted, the computer-generated data and other materials submitted with the proposal did not purport to present the actual performance of the antenna which would be built according to the RFP specifications. Rather, the materials submitted with the proposals merely displayed the limitations of existing technologies and provided the technical evaluation team with a basis upon which to discern each offeror's ability to modify the equipment or to rectify any shortcomings in the currently-available technologies when building an antenna according to the RFP specifications. Only to this extent did the data represent the offeror's ability to perform under the contract. The true test of compliance with the specifications would occur at the first article testing.[17]

Such an approach to the evaluation of the technical proposals is rational. The antenna sought by the RFP had not yet been developed and, therefore, actual data depicting the antenna's performance was not yet available. *See* Chu Dep. at 57 ("You can't comply because the model actually hasn't been written yet—I mean built yet."). Moreover, all parties agree that the computer-generated models cannot perfectly imitate real conditions under which the antenna would operate. *See* Defendant's Proposed Findings of Fact and Conclusions of Law, as marked-up by Plaintiff TCI at 4, ¶ 11 (TCI does not dispute that the comput-

---

16. Plaintiff stresses Mr. Chu's testimony that Andrew never "told" Mr. Chu that the antenna would perform better than the computer-generated data provided to the agency in the May 13, 1991 submission. *See* Chu Dep. at 91. This testimony is ambiguous, at best; Mr. Chu did not appear to have any direct familiarity with the May 13 submission, as evidenced by the colloquy between Plaintiff's counsel and Mr. Chu at the deposition. *See* Chu Dep. at 91, 11. 18–22; 92, 11. 1–4. Moreover, Mr. Chu held firm to his belief that the actual ability to comply would be measured at the first article testing and not through computer models. *See* Chu Dep. at 44, 49, 71–72.

17. *See* Chu Dep. at 35 ("They aren't the actual tests. We won't find out until February 5th in the first article testing. These are just an indicator of how close, how good these antennas will be."); *id.* at 41–42. *See also* Triano Dep. at 19 ("We took the computer generated proposal—the computer generated figures as just indications of what the true antenna would do. So we did not take them [the data] as something that would be judged to comply or not comply with the spec."); Courtland Dep. at 23–24 (although the computer data was "merely speculative," it provided the technical evaluation team with "something more substantive" than the mere promise of compliance).

er programs do "not consider unknown variables such as uneven ground, weather, and atmospheric conditions.") In such circumstances, courts have approved procurements in which the agency predicts an offeror's ability to perform based upon the offeror's currently-available products and technological know-how. *See, e.g., Textron, Inc., Bell Helicopter Textron Division v. Adams,* 493 F.Supp. 824, 836 (D.D.C.1980) (reasonable for agency to speculate about offeror's ability to provide new SRR helicopter based upon performance of offeror's currently-available model).[18]

Given this evaluation posture, the GAO erred in concluding that Andrew's data and the accompanying submissions "prove" that the agency accepted a nonresponsive proposal and waived the requirements of the RFP. The critical question in assessing the rationality of the agency's technical evaluation is whether the agency had a reasonable basis upon which to find that Andrew could supply a product conforming to the specifications. According to TCI, the agency merely accepted promises of compliance at face value without any evaluation of the ability of each contractor to meet the specifications. The record belies this claim, however. The depositions reveal that the evaluation team examined the data presented by both offerors and found that both offerors could develop an antenna meeting the Navy's specifications given the offerors' technical expertise and the

available technologies. *See* Chu Dep. at 44, 55, 58, 72 and 81; Triano Dep. at 26–27; Courtland Dep. at 23–24, 26–27. Because both offerors had demonstrated sufficient expertise in this area and because both offerors warranted that they would provide a product meeting the specifications at first article testing, the contracting officers had sufficient basis upon which to find that the specifications would be met by either TCI or Andrew. If the product did not comply with the specifications at the first article testing, the proposal would be deemed nonresponsive and the contract would be in default. *See* Courtland Dep. at 16 ("We have no idea until first article test exactly ... where they stand"); *id.* at 32. *See also* Chu Dep. at 71–72.[19] Only after the evaluation team determined that both offerors presented technically acceptable proposals did the contracting officer award the contract to Andrew, the lowest-priced offeror. *See* Chu Dep. at 72.

B. *The Navy Did Not Violate Procurement Law in Refusing to Stay Performance of the Contract.*

■ On the tenth day after contract award, TCI timely filed its protest with the GAO. On the same day, TCI notified the Navy of its GAO protest both by telephone and by facsimile transmission. It is undisputed that the GAO did not formally advise the Navy of TCI's GAO-level protest until the fourteenth day after the contract award.[20] Thus, citing 31 U.S.C.

---

**18.** For the same reason, the GAO's reliance upon *Department of the Air Force—Recon. of Protest filed by Motorola, Inc.,* B–222181.2, 86–2 CPD ¶ 542 (Nov. 10, 1986) is misplaced. The *Motorola* protest involved a procurement in which the offeror submitted test results and certifications for the *actual* product being submitted in response to the solicitation evidencing the product's inability to meet the specifications. The computer-generated models submitted by the offerors in this procurement are only best estimates of the performance of the product to be developed upon the award of the contract.

**19.** The importance of first article testing distinguishes this procurement from the defective procurement in *Martin Marietta Corp.,* 90–1 CPD ¶ 132 (Jan. 31, 1990), relied upon by the GAO in its Opinion. *See* GAO Opinion at 5, n. 3 (citing *Martin Marietta* for the proposition that it is improper to accept a product which does not conform to the RFP specifications). In

*Martin Marietta,* the agency accepted an off-the-shelf computer system which, by the admission of the successful offeror, could not comply with the RFP's multi-tasking requirements. In fact, the agency conceded that it had accepted an "interim" product for immediate delivery and that the successful offeror would supply a conforming model after the first delivery. This case is entirely different. Both offerors have demonstrated the capability to provide a compliant product for first article testing. If the product eventually supplied cannot meet the specifications at first article testing, then the agency will place the contract in default. Thus, unlike *Martin Marietta, supra,* the agency has not waived the specifications in this procurement.

**20.** The parties do not dispute that the GAO notified the agency of the filing of the protest in a timely manner consistent with 31 U.S.C. § 3553(b)(1).

§ 3553(d)(1),[21] the Navy claimed that it was not notified of the protest by the GAO within the ten (10) day period prescribed by statute and refused to suspend contract performance. TCI contends that, by directly notifying the designated agency representative of the protest, the agency had "received notice" of the protest for purposes of triggering the 31 U.S.C. § 3553(d)(1) mandatory stay provision and was obligated to suspend contract performance.

TCI's argument lacks merit, for it flies in the face of the clear statutory language and established agency practice to the contrary. The Court addressed precisely this question in *Information Resources Inc. v. United States,* 676 F.Supp. 293 (D.D.C. 1987) and *Bendix Field Engineering v. United States,* No. 91–2733 (D.D.C., Nov. 15, 1991). Specifically, the *Information Resources* Court found that, given the statutory provisions codified at 31 U.S.C. § 3553, the phrase "notice of a protest under this section" "refers to notice from the Comptroller General." *Information Resources,* 676 F.Supp. at 296. Notice furnished to the agency by the protestor does not activate the mandatory stay provision. *Id.*

The reasoning in these cases is persuasive, as this interpretation of the statute is the only interpretation which does not render § 3553(b)(1) meaningless. Moreover, this interpretation is buttressed by agency's own unambiguous regulatory provisions. *See* 4 C.F.R. 21.4(b) ("When the contracting agency receives notice of a protest *from the General Accounting Office* after award of a contract, but within 10 days of the date of contract award, it shall immediately direct the contractor to cease contract performance ...") (emphasis added). Also, as the *Information Resources* Court pointed out, 676 F.Supp. at 296, n. 4, there is a valid policy-based justification for requiring notification directly

from the GAO; pursuant to 31 U.S.C. § 3554(a)(3), GAO can dismiss frivolous protests sua sponte in order to prevent unnecessary disruption of on-going contracts. Permitting a protestor's direct notification to the agency to halt an on-going contract would eviscerate GAO's ability to protect the procurement process from unnecessary delay.

TCI contends that this interpretation of the statute deprives protestors of the full ten days within which to receive the benefit of the mandatory stay provisions. *See* Memorandum in Support of Plaintiff's Request for a Permanent Injunction and An Order Directing Award of a Contract to TCI at 17. TCI is correct that there may exist situations, such as this one, in which protestors do not receive the benefit of the full ten days allotted by statute. However, this fact does not justify interpreting the statute and regulatory provisions in derogation of the clear language therein. *Cf. West Virginia University Hospitals, Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991). Moreover, by empowering the GAO to dismiss meritless protests sua sponte, Congress arguably envisioned situations in which protestors would not receive the benefit of the mandatory stay, even when the protest is filed within the ten (10) day period. Furthermore, Congress did not intend for protestors to enjoy the benefit of the full ten (10) day period at the expense of an orderly and fair procurement process. By including the GAO in the notification scheme established by the statute, Congress arguably determined that there was a need for a clearly-defined "chain of command" for notification purposes. In essence, the statute encourages the GAO to employ orderly procedures for the imposition of an injunction on contract performance. Without clearly-defined procedures, the GAO could be embroiled in endless disputes as to when, and whether, notice was received by the agen-

---

**21.** The statute provides: "If a Federal agency receives notice of a protest [filed with the GAO] after the contract has been awarded but within 10 days of the date of the contract award, the Federal agency ... shall, upon receipt of that notice, immediately direct the contractor to

cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under the contract. Performance may not be resumed while the protest is pending."

cy, further disrupting the procurement process.

CONCLUSION

Upon consideration of the arguments of the parties at the Hearing on the Merits, the record herein and the applicable law, the Court finds that the agency did not act irrationally and did not violate applicable law and regulations in awarding the contract to Defendant–Intervenor Andrew–Canada, Inc. The Court further finds that, upon learning of the protest filed by Plaintiff TCI, Inc., the Navy had a valid legal basis upon which to refuse to suspend contract performance. Accordingly, the Plaintiff's request for permanent injunction and for award of the contract shall be denied and the above-captioned case shall be dismissed.